**DIMAGGIO, LLC, Plaintiff,**

v.

**CITY AND COUNTY OF SAN FRANCISCO, Defendant.**

No. 00–6728–CIV.

United States District Court, S.D. Florida.

June 29, 2000.

Wilfredo J. Martinez, Hunton & Williams, Miami, FL, Counsel for Plaintiff.

Jeffrey M. Herman, Herman & Grubman, Miami, FL, Counsel for Defendant.

### ORDER GRANTING MOTION TO DISMISS

LENARD, District Judge.

**THIS CAUSE** is before the Court on the Motion to Dismiss filed by Defendant City and County of San Francisco on June 15, 2000. Plaintiff DiMaggio, LLC filed a Response June 20, 2000, on which date the Court heard oral arguments on the Motion from counsel for both parties. Having reviewed the Motion, the Response, and the record, and having listened to the oral arguments from both parties, the Court finds as follows.

### I. Introduction

This dispute came before the Court as a Complaint and Motion for Preliminary Injunction enjoining the City and County of San Francisco, California ("San Francisco") from naming its North Beach Playground after native San Franciscan, Joe DiMaggio, without the consent of Plaintiff DiMaggio, LLC ("DiMaggio"). Residing in the State of Florida, DiMaggio argues it possesses sole authorization to permit the use of Joe DiMaggio's name by a municipality or anyone else.

Joe DiMaggio is not only an American hero, but an icon of American culture. Initially known as the Yankee Clipper for his unparalleled grace on the baseball diamond as a New York Yankee,[1] Joe DiMaggio owns the major league baseball record for the longest hitting streak at 56 games,[2] as well as his own "first ballot" shrine at the Baseball Hall of Fame in Cooperstown, New York, despite losing three years of his baseball career to military service in the Second World War. The Yankee Clipper's fame, however, transcends the storied, outfield columns of Yankee Stadium. For example, Joe DiMaggio is synonymous with Mr. Coffee, based on his years of endorsing the product bearing the same name.[3] In addition, he is perhaps equally

---

1. "I must have confidence and I must be worthy of the great DiMaggio who does all things perfectly even with the pain of the bone spur in his heel." Ernest Hemingway, *The Old Man and the Sea* 75 (1960).

2. *See Selig v. United States*, 740 F.2d 572, 573–74 (7th Cir.1984) (citing "Joe DiMaggio's remarkable 1941 season: .357, 30 home runs, 125 RBI, and the 56–game hitting streak" as one of baseball's "greatest memories").

3. *See Peerless Ins. Co. v. Texas Commerce Bank–New Braunfels*, 791 F.2d 1177, 1178 (5th Cir.1986) (stating that "Joe DiMaggio confidently extolled the virtues of 'Mr. Coffee' coffee makers").

well known for both his marriage to Marilyn Monroe and the reference to his name in the Simon and Garfunkel song, "Mrs. Robinson," within which Paul Simon asks, "Where have you gone Joe DiMaggio? Our nation turns its lonely eyes to you." [4] Though this Court finds itself asking the same question, sadly, "Joltin' Joe has left and gone away." [5]

The Court, before reaching the merits of the instant dispute, must determine whether it has jurisdiction to do so. The ultimate jurisdictional question *sub judice* is apparently a matter of first impression for the Eleventh Circuit: whether a foreign municipality may be haled into federal court, in a state where the estate of an American celebrity resides, for remembering that person by naming one of its municipal landmarks after him. On the basis of the facts presented, the Court finds that exercising personal jurisdiction over San Francisco for naming a single landmark after one of its deceased, native sons, whose estate resides in the State of Florida, would violate San Francisco's due process rights because San Francisco has not established minium contacts with the State of Florida.

## II. Factual Background

On March 8, 1999, Joe DiMaggio died. On March 22, 1999, the San Francisco Board of Supervisors adopted Resolution No. 258–99 "urging the Mayor of the City and County of San Francisco to consult with the DiMaggio Family and to form a committee to recommend an appropriate way the City should memorialize Joe DiMaggio." (City and County of San Francisco Board of Supervisors Meeting Minutes of 3/22/99 at 2.)

By April 9, 1999, San Francisco was aware that one of its Supervisors, Gavin Newsom, was "coordinating" the Joe DiMaggio memorialization project for San Francisco. (*See* Letter from City of San Francisco Mayor Willie L. Brown, Jr. to Daniel Woodhead of 4/9/99 at 1.) Newsom stated,

> At some point I became aware that a Florida lawyer by the name of Morris Engelberg managed the estate of Joe DiMaggio, and that Mr. Engelberg had expressed strong views about public entities naming landmarks after Joe DiMaggio. I became aware that Mr. Engelberg had become embroiled in a controversy over New York City's efforts to name a street after Joe DiMaggio.

> As part of my effort to build public consensus, I decided to ask Mr. Engelberg for his suggestions for a San Francisco tribute to Joe DiMaggio. My staff and I left at least [ten] telephone messages for him, but we did not receive a return call.

(Newsom Decl. ¶¶ 10–11.)

Thereafter, on June 16, 1999, Newsom faxed a letter to Engelberg, received on that date. The letter, written on Newsom's San Francisco Board of Supervisor stationery, states in pertinent part:

> [L]et me convey to you my desire to avoid some of the controversy that has happened in New York regarding the memory of Mr. DiMaggio.

> As you know, it was the desire of many San Franciscans that we honor Joe DiMaggio with some type of memorial. It was my desire that we honor the wishes of the people but primarily act upon the

---

**4.** Simon & Garfunkel, *Mrs. Robinson, on Bookends* (Columbia, 1968). The song and lyric were covered nearly a quarter of a century later. *See* The Lemonheads, *Mrs. Robin-* son, on *It's a Shame About Ray* (Atlantic Recording Co., 1992).

**5.** *See* n. 4, *supra*.

desires of the family. We have received hundreds of pieces of written correspondence, E Mail, and phone calls with suggestions. The top ten suggestions I have listed below:

1. North Beach Playground
2. Pacific Bell Park
3. Big Rec at 7th and Lincoln
4. San Francisco/Oakland Bay Bridge
5. The field at Moscone Recreation Center (Formerly Funston playground)
6. 5th Street
7. San Francisco International Airport
8. The Mall at the Old Seal Stadium site
9. Columbus Ave.
10. Marina Blvd.

My personal favorite is North Beach Playground.

North Beach is the Italian neighborhood of San Francisco and the importance of Joe DiMaggio to the Italian–American community Nation wide cannot be underestimated. I believe that it would generate little controversy and would be an appropriate memorial.

I will be available at your convenience to discuss these suggestions or any others that you or the family may have.

(Letter from Newsom to Engelberg of 6/16/99 at 1–2.)

Engelberg, construing Newsom's letter as an "offer," faxed Newsom a reply informing him that were Joe DiMaggio alive, he would have preferred San Francisco honor him by naming either the San Francisco/Oakland Bay Bridge or the San Francisco International Airport after him. (*See* Facsimile from Engelberg to Newsom of 6/18/99 at 1.) Engelberg's fax continued, "I can well appreciate that the North Beach Playground is your personal favorite, however, we all must attempt to do what Joe DiMaggio would have done had he been here to make this decision." (*Id.* at 1.)

After Engelberg sent Newsom the foregoing response, Engelberg spoke with either Newsom or Newsom's assistant over the telephone. During the course of these "several" phone conversations, Newsom and his assistant attempted to "get [Engelberg's] authorization to rename the North Beach Playground after Joe DiMaggio," and "[e]ach time, [Engelberg] told them no." (Engelberg Aff. ¶ 2.)

On February 17, 2000, Engelberg ultimately sent another letter to Newsom. This letter advised him that Plaintiff did not approve of San Francisco renaming the North Beach Playground after Joe DiMaggio, and that were San Francisco to proceed against the wishes of the DiMaggio family and Engelberg's approval, he would take legal action against Defendant. (*See* Letter from Engelberg to Newsom of 2/17/00 at 1.)

On April 24, 2000, the San Francisco Board of Supervisors unanimously adopted a resolution to change the name of North Beach Playground to "Joe DiMaggio North Beach Playground." (Newsom Decl. ¶ 14.) On May 5, 2000, San Francisco Mayor Willie Brown approved the resolution. (*See id.* ¶ 15.)

## III. Procedural Background

On May 31, 2000, DiMaggio filed a Complaint against San Francisco in this Court. In the Complaint, DiMaggio sued San Francisco for: (1) invasion of privacy under Florida law; (2) false endorsement under the Lanham Trade–Mark Act of 1946 ("Lanham Act"), 15 U.S.C. § 1125(a)(1)(A) (1994 & Supp.1999); (3) violating DiMaggio's common law right of publicity; and (4) dilution under the Lanham Act, 15 U.S.C. § 1125(c).

On the same date, DiMaggio also filed a Motion for Preliminary Injunction to block the enforcement of San Francisco's resolution naming the North Beach Playground

after Joe DiMaggio. San Francisco filed a Response to the Motion for Preliminary Injunction on June 15, 2000.

On June 16, 2000, San Francisco filed the instant Motion to Dismiss. On June 19, 2000, DiMaggio filed a Response, and on June 20, 2000, this Court heard oral arguments from both parties regarding the Motion to Dismiss and the Motion for Preliminary Injunction.

## IV. Analysis

In order for a district court to adjudicate a controversy, it must first find that it has both jurisdiction over the subject matter of the controversy and jurisdiction over the person of the defendant. *See Duplantier v. United States,* 606 F.2d 654, 663 n. 19 (5th Cir.1979).[6] Subject matter jurisdiction and in personam jurisdiction are separate and distinct concepts, and the existence of one does not excuse the absence of the other. *See id.*

### A. Subject Matter Jurisdiction

DiMaggio alleges two theories of subject matter jurisdiction: federal question and diversity jurisdiction. Suing under the Lanham Trade–Mark Act of 1946 (the "Lanham Act"), 15 U.S.C. § 1125(a) (1994 & Supp.1999), DiMaggio establishes federal question jurisdiction and supplemental jurisdiction for this Court to review any collateral state law claims. *See King v. Ames,* 179 F.3d 370, 372 (5th Cir.1999). As such, the Court need not examine whether it may exercise diversity jurisdiction in this matter.

### B. Personal Jurisdiction

It is well settled that "[t]he due process clause ... constrains a federal court's power to acquire personal jurisdiction" over a nonresident defendant. *In re*

*Chase & Sanborn Corp.,* 835 F.2d 1341, 1344 (11th Cir.1988), *rev'd on other grounds sub nom. Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). To determine whether personal jurisdiction over a non-resident defendant may be exercised, the court must determine: (1) whether the state long arm statute permits assertion of jurisdiction; (2) whether minimum contacts exist to satisfy the due process requirements of the Fourteenth Amendment; and (3) whether the maintenance of the suit would offend "traditional notions of fair play and substantial justice" under *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). *See Madara v. Hall,* 916 F.2d 1510, 1514 (11th Cir.1990); *Lauzon v. Joseph Ribkoff, Inc.,* 77 F.Supp.2d 1250, 1253 (S.D.Fla.1999).

#### 1. Long Arm Statute

The Court first analyzes Florida's long-arm statute, which provides:

(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the court of this state for any cause of action arising from the doing of any of the following acts:

. . . . .

(b) Committing a tortious act within this state.

Fla. Stat. § 48.193(1)(b) (West 1993). Here, DiMaggio contends that this Court may exercise personal jurisdiction over San Francisco pursuant to this statute be-

---

**6.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit, including Unit A, handed down prior to October 1, 1981.

cause San Francisco injured Joe DiMaggio's name and likeness, which are located in Florida.

■ In *Robinson v. Giarmarco & Bill,* 74 F.3d 253, 257 (11th Cir.1996), the Eleventh Circuit found personal jurisdiction under Fla. Stat. § 48.193(1)(b), where the defendants' negligence "allegedly caused damage to an estate in Florida." The *Robinson* court reviewed a civil action filed against nonresidents, who had negligently rendered estate planning services to a Florida resident. Finding their negligence resulted in the commission of a tortious act in Florida, the *Robinson* court reiterated the well established rule in the Eleventh Circuit that jurisdiction "under § 48.193(1)(b) is not limited to a situation where an act in Florida causes an injury in Florida but also ... reaches the situation where a foreign tortious act causes injury in Florida." *Robinson,* 74 F.3d at 257 (quoting *Sun Bank, N.A. v. E.F. Hutton & Co.,* 926 F.2d 1030, 1033 (11th Cir.1991) (citation and internal quotation marks omitted)).

The Eleventh Circuit revisited the issue of what constitutes personal jurisdiction under Fla. Stat. § 48.193(1)(b) and acknowledged a split among the State of Florida appellate courts, but nevertheless recognized, "[t]hroughout this longstanding conflict among the state district courts of appeal, this court consistently has applied the broader construction of subsection (1)(b)." *Posner v. Essex Ins. Co., Ltd.,* 178 F.3d 1209, 1216 (11th Cir.1999) (citing *Robinson,* 74 F.3d at 257; *Sun Bank,* 926 F.2d at 1033–34; *Bangor Punta Operations, Inc. v. Universal Marine Co.,* 543 F.2d 1107, 1109 (5th Cir.1976); *Rebozo v. Washington Post Co.,* 515 F.2d 1208, 1212–13 (5th Cir.1975)). The *Posner* court explained that were the Florida Supreme Court to reject the "broader" construction of Fla. Stat. § 48.193(1)(b), the Eleventh Circuit "would be obliged ... to follow

that Court's interpretation of the statute." *Posner,* 178 F.3d at 1216–17 (citations omitted). Without this rejection, however, the *Posner* court held that the Eleventh Circuit is "bound ... to follow [its] firmly established precedent, which interprets subsection (1)(b) to apply to defendants committing tortious acts outside the state that cause injury in Florida." *Posner,* 178 F.3d at 1217. Therefore, the Court finds that DiMaggio's allegation that the naming of North Beach Playground caused an injury to the estate of Joe DiMaggio is sufficient to bring San Francisco within the reach of Florida's long arm statute.

### 2. Minimum Contacts

Satisfying the long-arm statute does not end the inquiry, however. The Court must determine whether San Francisco's expression of its intent to memorialize its native son, Joe DiMaggio, by naming his childhood playground after him is sufficient to establish minimum contacts with the State of Florida. DiMaggio alleges that Joe DiMaggio's name is privately-held intellectual property under DiMaggio's control. For the purpose of resolving the issue of personal jurisdiction, the Court thus treats the name, "Joe DiMaggio," as it would any other valuable piece of property located in the State of Florida.

■ In *Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1548 (11th Cir.), *cert. denied sub nom., Regie Nationale Des Usines Renault S.A. v. Vermeulen,* 508 U.S. 907, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993), the Eleventh Circuit developed a three-part test for a defendant's contacts with the applicable forum to constitute constitutionally minimum contacts:

First, the contacts must be related to the plaintiff's cause of action or have given rise to it. [*Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985); *Madara v.*

*Hall,* 916 F.2d 1510, 1516 (11th Cir. 1990).] Second, the contacts must involve "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum ..., thus invoking the benefits and protections of its laws." [*Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *see also Burger King,* 471 U.S. at 474–75, 105 S.Ct. 2174]. Third, the defendant's contacts with the forum must be "such that [the defendant] should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

*Vermeulen,* 985 F.2d at 1546. Ultimately, the *Vermeulen* court conceded that clarifying the terms, "purposeful availment" and "reasonably anticipate," is no routine 6–4–3 double play, *id.* (finding "the current state of the law regarding personal jurisdiction is unsettled"), but not before discussing the terms at length, as defined by two Supreme Court opinions, *World–Wide Volkswagen,* 444 U.S. at 286, 100 S.Ct. 559, and *Asahi Metal Industry Co. v. Superior Ct. of Cal.,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (plurality opinion). *See Vermeulen,* 985 F.2d at 1546–48. Though the *Vermeulen, World–Wide Volkswagen,* and *Asahi* decisions stared down the instant jurisdictional questions involving the sale of goods and services within the private sector, this Court finds these cases instructive on the jurisdictional question *sub judice.*

The *World–Wide Volkswagen* opinion established a broader standard for "purposeful availment" and "reasonably anticipate" than did the plurality opinion in *Asahi.* In *World–Wide Volkswagen,* the Court held that "foreseeability" alone was an insufficient benchmark for personal jurisdiction under the Due Process Clause. *World–Wide Volkswagen,* 444 U.S. at 295, 100 S.Ct. 559. The same Court, however, found that foreseeability was not only relevant, but critical, to the jurisdictional inquiry. *Id.* at 297, 100 S.Ct. 559. The *World–Wide Volkswagen* Court stated further that if a single sale

is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has been the source of injury to its owner or to others.

*Id.* at 297–98, 100 S.Ct. 559. A forum state, according to the *World–Wide Volkswagen* Court, may exercise "personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state." *Id.*

Applying this standard to the facts before it, the *World–Wide Volkswagen* Court held that the "stream of commerce" analysis did not supply a basis for Oklahoma to exercise jurisdiction over a New York-based automobile distributor and retailer, who sold the plaintiff an automobile that caught fire as a result of a collision in Oklahoma. *See id.* at 312, 100 S.Ct. 559. In support of this holding, the *World–Wide Volkswagen* Court found that the nonresident defendant automobile distributor and retailer "carr[ied] no activity whatsoever in Oklahoma;" "close[d] no sales and perform[ed] no services there;" "avail[ed] themselves of none of the privileges and benefits of Oklahoma law;" "solicit[ed] no business there either through salesperson or through advertising reasonable calculated to reach the State;" did not "regularly sell cars at wholesale or retail to Oklahoma customers or residents;" and did not "indirectly, through others, serve or seek to serve the Oklahoma market." *Id.* at 295, 100 S.Ct. 559.

In conclusion, the Court articulated the following principle of jurisdictional jurisprudence: "the mere 'unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.'" *Id.* at 298, 100 S.Ct. 559 (quoting *Hanson,* 357 U.S. at 253, 78 S.Ct. 1228). Moreover, the *World–Wide Volkswagen* Court refused to infer that "because one automobile sold by [the defendants] had been used in Oklahoma, others might have been used there also." *World–Wide Volkswagen,* 444 U.S. at 298, 100 S.Ct. 559. The Court held further that "financial benefits accruing to the defendant from a collateral relation to the forum State will not support jurisdiction if they do not stem from a constitutionally cognizable contact with the State." *Id.* at 299, 100 S.Ct. 559 (citing *Kulko v. California Superior Ct.,* 436 U.S. 84, 94–95, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978)).

The *Asahi* plurality found no minimum contacts when the defendant placed its product into the stream of commerce, "and the stream eventually swept defendant's product into the forum State, but the defendant did nothing else to purposefully avail itself of the market in the forum State." *Asahi,* 480 U.S. at 110, 107 S.Ct. 1026 (plurality opinion). The *Asahi* standard thus became a "stream of commerce plus" test, as Justice O'Connor writing for the plurality explained,

> [t]he placement of the product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.

*Id.* at 112, 107 S.Ct. 1026 (plurality opinion). Applying this "stream of commerce plus" standard to the facts before it, the *Asahi* plurality found a tire manufacturer from Taiwan: placed its tires into the stream of commerce, but did not do business in California; had no office, agents, or property in California; did not advertise or otherwise solicit business in California; and did not create, control, or employ the distribution system that brought the tire valves to California. *See id.*

In *Vermeulen,* the Eleventh Circuit did not adopt one Supreme Court standard over the other, as the *Vermeulen* court determined that personal jurisdiction over the defendant was consistent with the more stringent "stream of commerce plus" standard. *See Vermeulen,* 985 F.2d at 1548 & n. 17; *see also Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1566 (Fed.Cir.1994) (finding under either version of stream of commerce theory, plaintiff made required jurisdictional showing and thus did not adopt one theory over another). Furthermore, neither the Supreme Court nor any other federal court has apparently had the opportunity to apply one of these "stream of commerce" theories to a dispute arising out of a municipality's attempt to use a name, which a private estate allegedly has the rights to control. The First, Second, and Sixth Circuits, however, have examined the instant jurisdictional question in the context of a dispute under the Lanham Act and in so doing have either explicitly or implicitly followed the *Asahi* plurality's "stream of commerce plus" test. While not reviewing this question in the context of the Lanham Act, the Fifth Circuit has analyzed the issue in the context of a copyright action. First discussing these circuit court decisions, the Court explores whether San Francisco's actions in this

matter are sufficient to find that minimum contacts with Florida exist under either version of the "stream of commerce" theory.

### a. "Stream of Commerce Plus" Theory

In *Keds Corp. v. Renee Int'l Trading Corp.,* 888 F.2d 215, 217 (1st Cir.1989), a Massachusetts-based shoe manufacturer sued a New York-based competitor in a Massachusetts-seated federal court for trademark infringement. Analyzing the jurisdictional question, the First Circuit stated that "[t]his is not a case where [the defendant] put the shoes into the stream of commerce and they fortuitously ended up in Massachusetts." *Id.* at 220 (citing *Asahi,* 480 U.S. at 108–112, 107 S.Ct. 1026 (plurality opinion)). In *Keds,* the case involved the defendant's sale of 6,000 shoes to a purchaser in Massachusetts who intended to sell the shoes there. *Keds,* 888 F.2d at 219. On the basis of that significant sale and the defendant's shipment of "samples to [the purchaser] in the hope that additional sales, and perhaps a long-term relationship, would develop," the *Keds* court found the defendant "could reasonably expect to be sued in Massachusetts, given its clear intent to begin distribution in Massachusetts." *Id.* at 220.

In *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1107 (2d Cir.1997), a New York-based retailer of weight loss products sued a Georgia-based patentee in a New York-seated federal court for declaratory judgment that the patentee did not have standing to sue the retailer under the Lanham Act's false advertising provision. Between July and October 1993, the patentee's attorney "frequently contacted" the retailer or its subsidiary "by phone and letter from his firm's New York City office, purportedly to negotiate a settlement" of the patentee's allegations that some of the retailer's products violated the patentee's patent. *Id.* at 1109. The retailer "maintained,

however, that [the attorney's] real purpose was to solicit PDK's investment in his weight loss product." *Id.* In one of the attorney's letters, he asked the retailer's "counsel to 'call so we can explore the investment mode(s) more fully.'" *Id.* Having not settled this dispute by October 1993, the patentee's attorney sent the retailer a "Demand for Relief" under Georgia state law and warned that he would assert other legal claims. *Id.* Characterizing the patentee-defendant's efforts as a "persistent campaign," the *Patterson* court found that a federal court located in New York could exercise jurisdiction over the defendant. *Id.*

In *CompuServe, Inc. v. Patterson,* 89 F.3d 1257, 1265 (6th Cir.1996), an Ohio-based computer information and network service sued one of its Texas-based subscribers in an Ohio-seated federal court for declaratory judgment that the service had not, *inter alia,* infringed on the subscriber's common law trademarks. The *Patterson* court found that "merely entering into a contract with [the plaintiff] would not, without more, establish that [the defendant] had minimum contacts with Ohio," the forum state. *Id.* (citing *Burger King Corp.,* 471 U.S. at 478, 105 S.Ct. 2174). Continuing, the Sixth Circuit rejected the *World–Wide Volkswagen's* "stream of commerce" test, *Patterson,* 89 F.3d at 1267 (comparing *Asahi,* 480 U.S. at 112, 107 S.Ct. 1026 (plurality opinion) *with Asahi,* 107 S.Ct. at 1034–35 (Brennan, J., concurring in part)), but concluded that the combination of entering into a contract with the plaintiff and placing the defendant's software product into the stream of commerce was sufficient to support jurisdiction. *Patterson,* 89 F.3d at 1267.

█ Under the *Asahi* plurality's "stream of commerce plus" test, adopted by the First, Second, and Sixth Circuits, this Court concludes it lacks personal jur-

isdiction over San Francisco. The Court finds Supervisor Newsom acted with San Francisco's apparent authority to communicate with DiMaggio about the North Beach Playground project, based on the facts that: (1) San Francisco's imprimatur was printed on the June 16, 1999 letter and (2) San Francisco Mayor Willie Brown had previously recognized Newsom as the project's coordinator. The June 16, 1999 letter from Supervisor Newsom, however, was merely an invitation for discussion and an effort to build political consensus on the issue of how the San Francisco could best remember and honor the memory of Joe DiMaggio. Moreover, even if the Court were to determine Newsom and Engelberg were engaged in contract negotiations, these communications were merely demonstrative of negotiations for a single transaction and in no way portended either a long-term relationship between the parties or a grand scheme to name a myriad of San Francisco landmarks after the Yankee Clipper. *Cf. Keds,* 888 F.2d at 217. The Court further finds no evidence of a "persistent campaign" on the part of Newsom or any other agent to broker a long-term relationship with DiMaggio. *Cf. Friedlander,* 103 F.3d at 1107. When San Francisco passed its resolution to name North Beach Playground after Joe DiMaggio, neither the resolution nor San Francisco made any additional overtures of either naming further landmarks after Joe DiMaggio or establishing further contact with DiMaggio. Thus, under the "stream of commerce plus" test in *Asahi,* this Court concludes it lacks personal jurisdiction for want of San Francisco's minimum contacts with the forum state.

#### b. "Stream of Commerce" Theory

The Fifth Circuit has adopted the pre-*Asahi* version of the "stream of commerce" theory in the context of a copyright dispute, "[a]bsent rejection by a majority on the Supreme Court." *Ham v. La Cienega Music Co.,* 4 F.3d 413, 416 n. 11 (5th Cir.1993) (citing *Irving v. Owens–Corning Fiberglas Corp.,* 864 F.2d 383 (5th Cir.), *cert. denied sub nom., Jugometal Enterp. for Import & Export of Ores & Metals v. Irving,* 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 49 (1989)). In *Ham,* 4 F.3d at 416, the Fifth Circuit determined that a federal court seated in Texas lacked personal jurisdiction because the plaintiff could not demonstrate that the nonresident defendant had established minimum contacts with the forum state. The *Ham* case involved a claim for declaratory judgment that the plaintiff could not be found liable for infringement of the defendant's copyright on his well-known song and its progeny. Under facts of that case, on July 8, 1991, the nonresident defendant wrote the plaintiff a letter claiming that the song to which the plaintiff owned the rights, "La Grange," infringed the defendant's copyrights. *See id.* at 415. The plaintiff in *Ham* had intended to market and distribute "La Grange" throughout the forum state. Thus, after receiving defendant's letter, the plaintiff sought a declaratory judgment against the defendant. The *Ham* court found, however, that resolution of the underlying action depended "solely upon whether 'La Grange' infringed copyrights owned by [the defendants]" and concluded that the plaintiff's intent to exploit his own copyrights in the forum state and beyond "in no way relates to the merits of that question." *Id.* at 416. Adopting the pre-*Asahi* standard for determining minimum contacts, the *Ham* court further found that the defendant's July 8, 1991 letter "although it forms the basis for [the plaintiff's] allegations about the existence of a live controversy, in no way relates to the merits of the copyright question and thus does not support personal jurisdiction in Texas." *Id.*

■ Unlike the letter discussed by *Ham*, 4 F.3d at 416, this Court finds Newsom's letter and subsequent "several" phone calls with Engelberg form the basis of DiMaggio's underlying intellectual property claims and relate to the merits of the case. The Court, however, is unwilling to find that minimum contacts, even under the broad *World–Wide Volkswagen* standard, have been established when a municipality makes inquiry to a representative of a celebrity's estate in a foreign jurisdiction for suggestions about how to remember that celebrity. San Francisco is not in the business of naming its landmarks after Joe DiMaggio, nor has it attempted to name any of its other landmarks after Joe DiMaggio. In fact, the Court finds San Francisco's effort to name the North Beach Playground after the Yankee Clipper is "simply an isolated occurrence." *Id.* at 297–98, 100 S.Ct. 559. San Francisco, one could say, has no pretenses of taking this game into extra innings.

Further, the Court notes that when a nonresident defendant

> "purposefully avails itself of the privilege of conducting activities within the forum State," . . . it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State.

*Id.* at 297, 100 S.Ct. 559 (quoting *Hanson*, 357 U.S. at 253, 78 S.Ct. 1228). The Supreme Court has emphasized that minimum contacts must be grounded in "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections its laws." *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174. This Court finds that when Supervisor Newsom asked Engelberg for suggestions as to how San Francisco might

remember Joe DiMaggio, San Francisco in no way sought to avail itself of the privileges and protections of the laws of the State of Florida. DiMaggio has not demonstrated that San Francisco houses a San Francisco "Bureau of Tourism" in Florida, nor has DiMaggio shown that San Francisco has advertised or marketed San Francisco as a tourist destination to Florida residents. No deal was ever closed between the parties in Florida or anywhere else, and San Francisco has not performed any services in the Sunshine State. *Cf. World–Wide Volkswagen*, 444 U.S. at 295, 100 S.Ct. 559. In a sense, San Francisco never stepped into the batter's box.

**c. Conclusion**

Having concluded that there is no "constitutionally cognizable interest" between San Francisco and Florida under either version of the "stream of commerce" standard, the Court balks and does not adopt one standard over the other.

**3. Fair Play and Substantial Justice**

Even were the Court to have found San Francisco had established minimum contacts with the State of Florida, this Court finds its exercise of jurisdiction in this matter would nevertheless "offend 'traditional notions of fair play and substantial justice.'" *Asahi*, 107 S.Ct. at 1033 (majority opinion) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

As the Eleventh Circuit recognized in *Vermeulen*, Justice Brennan joined the portion of Justice O'Connor's opinion regarding "fair play and substantial justice." *See Vermeulen*, 985 F.2d at 1547 (referring to *Asahi*, 480 U.S. at 116, 107 S.Ct. 1026 (Brennan, J., concurring) ("I do agree . . . with the Court's conclusion . . . that the exercise of personal jurisdiction over Asahi in this case would not comport with 'fair play and substantial justice.'") (citation

omitted)). The segment of Justice O'Connor's opinion discussing "fair play and substantial justice" is thus a majority opinion of the Supreme Court.

 The *Asahi* Court found that "the determination of the reasonableness of the exercise of jurisdiction" depends on the following factors: the burden on the defendant, the interests of the forum State, the plaintiff's interest in obtaining relief, and " 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.' " *Asahi*, 480 U.S. at 113, 107 S.Ct. 1026 (quoting *World–Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. 559).

 Examining each factor individually, the Court "reveals the unreasonableness of the assertion of jurisdiction over" San Francisco. *Asahi*, 480 U.S. at 114, 107 S.Ct. 1026. The Court finds the burden on San Francisco to travel 3,000 miles to litigate this action is severe. San Francisco is not a private corporation, but a municipality whose financial resources are limited in ways those of private institutions are not. Recognizing the potential for injury to DiMaggio, located in Florida, the Court finds the impact of this case will affect the interests of DiMaggio and the forum state, but not to a deleterious degree. Efficient resolution of this sort of controversy may, in many cases, take place in the state where the estate is located. That, however, is not this Court's only concern. American cities each have their own stories, histories, geographies, and topographies. A dispute, such as the one at bar, critically depends on the Court's ability to take into account not only how the landmark might affect the value of a celebrity's name, but also how a celebrity's name will impact a particular landmark and its surrounding neighborhoods. Sitting in Miami, Florida, this Court therefore finds itself comparatively less equipped to exercise the sensitivities necessary to make such determinations regarding a municipality 3,000 miles away.

## V. Conclusion

Having established that San Francisco does not have minimum contacts with Florida and that exercising personal jurisdiction would "offend 'traditional notions of fair play and substantial justice,' " *Asahi*, 107 S.Ct. at 1033 (majority opinion) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)), the Court finds it lacks personal jurisdiction over San Francisco in this matter. Unlike the game of baseball, personal jurisdiction in federal court is not a fielder's choice. Accordingly, it is

**ORDERED AND ADJUDGED** that:

1. The Motion to Dismiss, filed June 15, 2000 by Defendant the City and County of San Francisco, is **GRANTED.**

2. This case is **DISMISSED** for lack of personal jurisdiction.

3. This case is **CLOSED.**

4. The *Motion for Preliminary Injunction*, filed May 31, 2000 by Plaintiff DiMaggio, LLC, and all other pending motions not otherwise ruled upon by separate order are **DENIED** as moot.