**GENERAL CIGAR HOLDINGS, INC., Plaintiff,**

v.

**ALTADIS, S.A.; Altadis U.S.A., Inc.; and Consolidated Cigar Holdings Inc., Defendants.**

No. 00–4187CIV.

United States District Court, S.D. Florida.

June 12, 2002.

Robert T. Wright, Jr., Ignacio Sanchez, Verner, Liipfert, Bernhard, McPherson and Hand, Miami, FL.

E. Marcellus Williamson, D. Benjamin Barros, Latham & Watkins, Washington DC.

Larry Kellogg, Peter F. Valori, Tew Cardenas Rebak Kellogg, Lehman Demaria & Tague, L.L.P., Miami, Florida.

Daniel R. Murdock, Brian L. Sullivan, Steven J. Young, Winston & Strawn, New York City.

### *ORDER GRANTING ALTADIS S.A.'S MOTION TO DISMISS AND ORDER GRANTING ALTADIS U.S.A., INC.'S AND CONSOLIDATED CIGAR HOLDINGS INC.'S MOTION TO DISMISS*

MORENO, District Judge.

Plaintiff, a cigar manufacturer, brought this action against a foreign competitor and two of its domestic subsidiaries, alleging violations of the Sherman Act, 15 U.S.C. §§ 1 & 2, the Clayton Act, 15 U.S.C. § 14, the Lanham Act, 15 U.S.C. § 1125(a), and state law relating to antitrust and unfair competition. Plaintiff contends that Defendants have attempted to monopolize the United States cigar market and have illegally exploited their exclusive right to sell Cuban cigars.

Before the Court are two motions to dismiss. Defendant Altadis, S.A. filed a motion to dismiss for lack of personal jurisdiction or, in the alternative, for failure to state a claim for which relief may be granted. Because the Court finds that Altadis, S.A. has insufficient ties to the State of Florida to satisfy the due process clause of the Fourteenth Amendment, this motion is GRANTED. Defendants Altadis U.S.A., Inc. and Consolidated Cigar Holdings, Inc. filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for which relief can be granted. The Court finds that Plaintiff's federal claims are insufficient as a matter of law. As to the remaining state claims, the Court declines to exercise supplemental jurisdiction. Accordingly, Altadis U.S.A., Inc. and Consolidated Cigar Holdings, Inc.'s motion is also GRANTED.

### BACKGROUND

Plaintiff General Cigar Holdings, Inc. is a New York based cigar manufacturer. Defendant Altadis, S.A., a Spanish corporation, is the world's largest producer and distributor of cigars. Altadis, S.A. allegedly does business in the United States through its subsidiaries, Defendants Altadis U.S.A, Inc. ("Altadis U.S.A.") and Consolidated Cigar Holdings, Inc. ("Consolidated Cigar"). Compl. ¶¶ 5,6,7.

In 1999, Altadis, S.A. was formed through the merger of Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes ("SEITA"), the French tobacco monopoly, and Tabacalera de España, S.A. ("Tabacalera"). At the time of the merger, two American subsidiaries of SEITA and Tabacalera, Consolidated Cigar and Havatampa, Inc., also merged. The result of this merger was Altadis U.S.A., a wholly owned subsidiary of Altadis, S.A. that is incorporated under Delaware law. Consolidated Cigar, also incorporated under Delaware law, survived the merger as a direct subsidiary of Altadis U.S.A. and an

indirect subsidiary of Altadis, S.A. Compl. ¶¶ 6, 7, 8.

According to the complaint, the mergers that created Altadis, S.A., Altadis U.S.A., and Consolidated Cigar also put them in a position to obtain monopoly power in certain cigar markets. Combining SEITA and Tabacalera allegedly gave Altadis, S.A. production and distribution of 78% of all premium cigars outside of the United States. Compl. ¶ 6; Plaint.Mem.Opp. to Altadis, S.A.'s Motion at 2. Within the United States, the combination of Consolidated Cigar and Havatampa allegedly resulted in a 39% share of the cigar market divided between Altadis U.S.A. and Consolidated Cigar. Compl. ¶ 14.

The position of Altadis, S.A. and Altadis U.S.A. became even stronger in September of 2000, when Altadis S.A. obtained a 50% interest in Corporación Habanos S.A., ("Habanos") a monopolist in Cuban cigars, trademarks, and trade names organized under Cuban law. Compl. ¶ 15. The remaining 50% of Habanos is owned by Empresa Cubana del Tabaco, an instrumentality of the Cuban government. Habanos is allegedly the only company authorized by the Cuban government to sell Cuban cigars for distribution outside of Cuba. While sale of Cuban cigars is currently illegal in the United States under the Cuban embargo, Altadis, S.A. contends that its arrangement with Habanos will put it in a "unique position in the U.S. once the embargo is lifted." Compl. ¶ 18.

Plaintiff portrays itself as the sole remaining significant competition to Altadis. In this light, Plaintiff claims that through predatory leverage and tying activities, Altadis is attempting to obtain a monopolistic and unfair dominance of the cigar market. Plaintiff alleges that Defendants have coerced customers to buy Defendants' cigars instead of competitor cigars. Specifically, Plaintiff alleges that Defendants have: (1) conditioned the future sale of Cuban cigars upon the current purchase of non-Cuban cigars, requiring retailers to maintain or increase their current purchases or else be left out of the Cuban cigar market; (2) made false and misleading representations that, after the Cuban embargo is lifted, Defendants will lawfully succeed to the brand names of "Partagas" and "Punch," which are registered trademarks of the Plaintiffs; and (3) illegally marketed and solicited the sale of Cuban cigars and by utilizing property and trademarks confiscated by the Cuban government in violation of Helms–Burton Act and the Cuban Asset Control Regulations. Compl. ¶¶ 19, 34, 29.

As a result of these alleged activities, Plaintiff filed this complaint, seeking damages and injunctive relief for violations of federal and state law. The claims include (1) attempted monopolization under Sherman Act § 2; (2) monopoly leveraging under Sherman Act § 2; (3) unreasonable restraint of trade under Sherman Act § 1; (4) tying and full-line forcing under Clayton Act § 3; (5) trademark infringement violations under Lanham Act, 15 U.S.C. § 1125(a); (6) violations of the Florida Antitrust Act of 1980, Fla.Stat. § 542.15, et. seq. (1999); (7) violations of the Florida Deceptive and Unfair Trade Practices Act, Fla.Stat. § 501.204 (1999); (8) violations of common law unfair competition law; and (9) violations of common law interference with prospective business relations.

Defendants filed their motions to dismiss these claims on December 7, 2000. Thereafter, the Court stayed discovery on all issues except whether the Court has personal jurisdiction over Altadis, S.A. After completion of such discovery, the parties submitted supplemental briefs and the Court held a hearing on the motions to dismiss.

## ANALYSIS

### I. Altadis, S.A.'s Motion to Dismiss for Lack of Personal Jurisdiction

 The doctrine of personal jurisdiction limits upon whom a court may impose a binding and enforceable judgment. *McGee v. Int'l Life Insurance Company*, 355 U.S. 220, 222, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). To invoke a court's *in personam* jurisdiction, a plaintiff must make a *prima facie* case by presenting enough evidence that jurisdiction exists to withstand a directed verdict. *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir.2002) (citing *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir.1990)). To contradict *prima facie* evidence of jurisdiction, a defendant may submit affidavits or other evidence showing that jurisdiction would be improper. The burden then shifts back to the plaintiff to produce evidence supporting jurisdiction unless such evidence contains only conclusory assertions. *Id.* In considering the affidavits and supporting evidence, the court must construe all reasonable inferences in favor of the plaintiff. *Id.*

### A. The Forum and the Contacts

 To determine whether personal jurisdiction exists, the Court examines the defendant's contacts with the applicable forum. That begs a question: which forum? Generally, a federal court with federal question jurisdiction looks to the state in which it sits. *See Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626–27 (11th Cir.1996). Where the court's jurisdiction is invoked based on a statute that authorizes nationwide or worldwide service of process, however, the applicable forum can be expanded to include the entire United States. *See United States Sec. &*

*Exch. Comm. v. Carrillo*, 115 F.3d 1540, 1544 (11th Cir.1997).

In this case, Plaintiff argues that the applicable forum is the United States, as opposed to the State of Florida, because "the federal statute at issue provides for nationwide service of process." Plaint. Mem. at 9. The Court assumes that Plaintiff refers to Section 12 of the Clayton Act, 15 U.S.C. § 22, which provides that personal jurisdiction is proper in any district, so long as sufficient national contacts have been established. *See Go–Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1413–15 (9th Cir.1989).

 While Section 12 of the Clayton Act does authorize worldwide service of process, Plaintiff actually served Altadis, S.A. under the Hague Convention,[1] not the Clayton Act. In *Carillo*, the court explained that the relevant forum is the United States "where service of process has been effected pursuant to a federal statute authorizing nationwide or worldwide service." *Carrillo*, 115 F.3d at 1543. This rule is "predicated on the well settled principle that service of process constitutes the vehicle by which the court obtains jurisdiction." *Id.* (internal quotation marks omitted). Thus, to activate the worldwide service provision of Section 12 of the Clayton Act, a plaintiff must actually serve the defendant pursuant to that provision. In *Doe v. Unocal Corp.*, 27 F.Supp.2d 1174, 1183 (C.D.Cal.1998), the court considered this issue where the Plaintiff brought RICO claims but did not serve the defendant under RICO's nationwide service provision. The court found that "it would be inappropriate for a federal court to effectively extend the territorial reach of a federal statute by applying a national contacts test for personal jurisdic-

---

**1.** *See* Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Jan. 8, 1969, art. 5, 20 U.S.T. 361, 658 U.N.T.S. 163; Fed.R.Civ.P. 4(f)(1).

tion where service is not effected pursuant to that federal statute." *Id.; see also Amtrol, Inc. v. Vent–Rite Valve Corp.,* 646 F.Supp. 1168, 1171 (D.Mass.1986) (finding the national contacts test appropriate based on § 12 of the Clayton Act because process was served on the alien corporation pursuant to the statute). It appears, therefore, that because Plaintiff served Altadis, S.A. under the Hague Convention rather than the Clayton Act, the applicable forum for determining Altadis, S.A.'s contacts is the State of Florida.[2]

After identifying the applicable forum, the Court's next task is to isolate Altadis, S.A.'s contacts with that forum. While Plaintiff points to numerous activities by Altadis, S.A. and its agents, most of these activities connect Altadis, S.A. with the United States as a whole, as opposed to the State of Florida. The contacts with Florida boil down to the following. First, executives of Altadis, S.A. attended three meetings related to the potential merger of Havatampa and Consolidated, and the United States cigar market in general. The first meeting, held on January 14, 2000 in Ft. Lauderdale, FL, was attended by Altadis, S.A.'s Vice President for Cigars at the time, Antonio Vasquez. According to Vasquez's deposition testimony, the purpose of the meeting was to discuss merger issues as well as "personnel issues and corporate office structure." Vasquez Dep. at 70–71. Around April 12, 2000 and September 6, 2000, similar meetings were held in Florida. According to Vasquez, these meetings were related to "the way in which the merger was taking place." *Id.* at 71.

Second, after the merger of Havatampa and Consolidated took place, Havatampa placed advertisements under the name "Tabacalera de España" in various nationwide publications such as *Cigar Aficionado, Golf Magazine, Golf Digest, Forbes* and *Fortune.* Presumably these publications were circulated in Florida as well. For example, the advertisements in *Cigar Aficionado* offered for sale cigars from "the first cigar company in the world" and announced "[n]ow, we bring our art to America." Plaint.Mem.Ex. 12. In *Forbes,* an advertisement represented that "[t]his is the seal of Tabacalera de España, the first cigar company in the world, now bringing quality cigars like Romeo y Julieta to America." Plaint.Mem.Ex. 14. Of course, as these advertisements were placed by Havatampa, they are not directly attributed to Altadis, S.A. Nonetheless, Plaintiff contends that the advertisements should be attributed to Altadis, S.A. because the cigars advertised were manufactured by companies owned by Altadis, S.A. the trademarks were owned by another Altadis, S.A. subsidiary, and the advertisements refer to the "heritage" of Tabacalera, S.A. (Altadis, S.A.'s predecessor in interest). Plaint.Supp.Mem. at 6.

Finally, Altadis, S.A. at one point sold its VegaFinas product in the United States, including Florida. According to Altadis, S.A.'s 1999 Annual Report, the introduction of this product led to a 7% upswing in sales volume over the previous year. Plaint.Supp.Mem.Ex. 2 at 29. It is unclear, however, how much of the sales were in Florida. In addition, sales of this product have been discontinued. Def. Supp.Mem. at 9.

---

**2.** As an alternative, Plaintiff also asserts that the Court could apply Fed.R.Civ.P. 4(k)(2), the national long-arm statute. Fed.R.Civ.P. 4(k)(2) permits courts to aggregate a nonresident defendant's contacts with the United States as a whole, but only if the defendant is not subject to the jurisdiction of any one state. As explained *infra,* however, the Court finds that Altadis, S.A. is within the reach of the Florida long-arm statute. Rule 4(k)(2) is therefore irrelevant.

## B. The Sufficiency of the Contacts

■ To determine whether these contacts with Florida are sufficient to allow this Court to exercise personal jurisdiction over Altadis, S.A., the Court conducts a two part analysis. First, the Court must consider whether the Florida long-arm statute provides a basis for personal jurisdiction. *Sculptchair*, 94 F.3d at 626. If it does, the Court must determine whether sufficient minimum contacts exist between the defendant and the forum state so as to satisfy "traditional notions of fair play and substantial justice" under the Due Process Clause of the Fourteenth Amendment. *Id.* (citations omitted). A court must comply with both the long-arm statutes of the forum state and the due process requirements of the Fourteenth Amendment to impose *in personam* jurisdiction over a defendant. *Burger King v. Rudzewicz*, 471 U.S. 462, 463–64, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

After considering the parties' evidence and hearing oral argument, the Court concludes that Altadis, S.A. falls within the reach of the Florida long-arm statute. While Altadis, S.A. is not conducting business in Florida, either by itself or through Altadis U.S.A., the Court finds that Plaintiff has adequately alleged that Altadis, S.A. has committed a tort within the state. This allegation is sufficient to invoke the long-arm statute. Nevertheless, the Court also finds that Altadis, S.A.'s activities are insufficient to satisfy the requirements of due process. Plaintiff has not established that Altadis, S.A. has purposely availed itself of the privilege of activity within Florida so as to invoke Florida's benefits and laws. Therefore, the Court must dismiss Plaintiff's case against Altadis, S.A. even though it is within the reach of Florida's long-arm statute.

### 1. Florida's Long–Arm Statute

Florida's long-arm statute restricts jurisdiction over non-residents to specifically enumerated instances. § 48.193, Fla.Stat. (2002). The statute provides in relevant part:

(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself ... to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:

(a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state;

(b) Committing a tortious act within this state.

. . . . .

(2) A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.

§ 48.193, Fla.Stat.

The scope of the Florida long-arm statute is decided by Florida law. *Meier*, 288 F.3d at 1271. This Court must therefore interpret the statute as would Florida Supreme Court and, absent any guidance from the state's highest court, this Court is bound to adhere to decisions of Florida's intermediate courts. *Id.* (citing *Sculptchair*, 94 F.3d at 627). In so doing, Florida's long-arm statute is to be "strictly construed." *Sculptchair*, 94 F.3d at 627.

In this case, Plaintiff argues that Altadis, S.A. has been engaging in significant business activity in Florida by itself and also through the actions of one of its subsidiaries. Altadis U.S.A. In addition,

Plaintiff argues that Altadis, S.A.'s allegedly wrongful activities amount to committing a tort within the forum. Thus, although not specifically stated, Plaintiff seeks to invoke § 48 193(2), § 48.193(1)(a) and § 48.193(1)(b).[3]

### a. General Jurisdiction under § 48.193(2)

General jurisdiction arises from a defendant's contact with the forum that is unrelated to the cause of action. *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292 (11th Cir.2000). As general jurisdiction allows a court to exercise jurisdiction over any type of suit whatsoever, the contacts must be especially pervasive and substantial to satisfy § 48.193(2). Accordingly, § 48.193(2) provides courts with general jurisdiction only over a defendant who has "substantial and not isolated" contacts with Florida. § 48.193(2), Fla.Stat.[4]

■ Plaintiff points to two bases to attempt to establish general jurisdiction over Altadis, S.A.: (1) the business activities of Altadis, S.A.; and (2) the activities of Altadis U.S.A., which Plaintiff claims should be imputed to Altadis, S.A. Neither of these arguments succeed. First, while Altadis, S.A. has had some activities in Florida, these contacts are insufficient when offered as "substantial and not isolated" business contacts for general jurisdiction. In *Meier*, for example, the Eleventh Circuit found that § 48.193(2) provided jurisdiction over the defendant who maintained staff in Florida and listed several Florida telephone numbers on its website. *Meier*, 288 F.3d at 1274. In addition, the defendant held seven bank accounts in Florida

and listed a Ft. Lauderdale attorney as its "Authorized Representative" and "Agent for Service." *Id.* Altadis, S.A.'s contacts, namely its three visits by a few employees, advertisements placed by a non-party subsidiary, and limited sales of a discontinued product, pale in comparison. Altadis, S.A.'s periodic presence in Florida simply does not subject it to personal jurisdiction over any suit that Plaintiff may bring. Thus, this Court has no general jurisdiction over Altadis, S.A. based on its contacts with Florida.

■ Plaintiff's claim of general jurisdiction based on an agency relationship between Altadis, S.A. and Altadis U.S.A., however, is a considerably closer question. In general, the presence of a subsidiary is insufficient on its own to establish jurisdiction over the parent corporation. *Meier*, 288 F.3d at 1272. A plaintiff must show that the subsidiary is merely an agent through which the parent company conducts business, "or that the subsidiary's separate corporate status is formal only and without any semblance of individual identity." *Id.* (internal quotation marks omitted). Stated simply, the parent company must have sufficient control over the actions of its subsidiary.

Plaintiff contends that such control exists here because of the regular and extensive contact between the two entities. For example, Altadis U.S.A. submits monthly financial reports to Altadis, S.A. and has no independent marketing plan or strategic plan, and produces no annual report or marketing report. Plaintiff also points to the overlapping duties of Antonio Vasquez,

**3.** Because Plaintiff argued in its pleadings that Altadis, S.A.'s national contacts as opposed Florida contacts apply, Plaintiff did not rely on any particular sections of the Florida long-arm statute. The Court must therefore match Plaintiff's general arguments with the applicable sections.

**4.** This standard is the functional equivalent of the continuous and systematic contact requirement for general jurisdiction under the Due Process clause of the Fourteenth Amendment. *Meier*, 288 F.3d at 1269 n. 6 (citing *Woods v. Nova Cos. Belize, Ltd.*, 739 So.2d 617, 620 (Fla. 4th DCA 1999)).

who was at one time both Vice President of Cigars at Altadis, S.A. and Chairman of Altadis U.S.A, and to correspondence between Vasquez and Theo Folz, the President and C.E.O. of Altadis U.S.A. Plaintiff points to e-mail correspondence whereby Folz allegedly sought Vasquez's approval before hiring an in-house lawyer by stating "I wanted to double check with you to reconfirm that this is ok." Plaint.Supp. Mem. at 10. In another e-mail. Folz "recommended" that eight employees be given an extension on their contracts. *Id.* Folz also contacted Vasquez with the following query: "When will it be appropriate to tell the people in the export department that they should keep doing what they have been doing and that Geoff is on assignment to develop a strategic plan." *Id.* at 11.

The contact between the two entities demonstrates what appears to be a very close working relationship. The evidence shows that Altadis U.S.A. conducts its business under the watchful eye of its parent. Clearly then, Altadis, S.A. exercises some control over the actions of Altadis U.S.A. As a result, the Court has paused over this issue, hesitant to find that an agency relationship does not exist.

However, after full consideration of the facts in this particular case, the Court concludes that Plaintiff has not demonstrated that Altadis, S.A. has a sufficient amount of control over Altadis U.S.A. to impute the actions of Altadis U.S.A. to Altadis, S.A. What is required for jurisdiction based on agency is not *some* control but *"operational* control" by the parent over the subsidiary. *State v. Am. Tobacco Co.,* 707 So.2d 851, 856 (Fla. 4th DCA 1998) (finding no agency despite the parent's issuance of policy statement directives to the subsidiary). Here, despite the regular contact between the two entities, Altadis U.S.A. owns and maintains its own production facilities, distributes its own products through its own sales organization, maintains its own accounts and pays its own employees. Carrie Dec. ¶¶ 18, 20; Folz Dep. at 26, 66, 69–70. While it has no independent marketing or strategic plans, it receives no such plans from Altadis, S.A. either. Folz Dep. at 113–14. Thus, although the Court acknowledges a corporate relationship that approaches an agency, the Court finds insufficient evidence to attribute to Altadis, S.A. control over Altadis U.S.A.'s basic operations.

As Altadis U.S.A. was created as the result of the merger of two independent corporations, it has principally maintained the operations of those corporations. Carrie Dec. at ¶¶ 13–18. In doing so, Altadis U.S.A. has maintained a "semblance" of independence from Altadis, S.A. *Meier,* 288 F.3d at 1272. Therefore, the Court concludes that Plaintiff has not met its burden to establish an agency relationship between Altadis U.S.A. and Altadis, S.A. to justify personal jurisdiction.

### b. Carrying on a Business in Florida under § 48.193(1)(a)

Plaintiff also claims that Altadis, S.A. may be subject to this Court's specific jurisdiction based on its business conduct in Florida as it relates to Plaintiff's causes of action. To succeed under § 48.193(1)(a), Plaintiff must show both that Altadis, S.A. has been "[o]perating, conducting, engaging in, or carrying on a business," and that Plaintiff's cause of action arises from that activity. For Plaintiff to establish that it was "[o]perating, conducting, engaging in, or carrying on a business" in Florida under § 48.193(1)(a), it must demonstrate that Altadis, S.A.'s contacts collectively show a "general course of business activity in the Florida for pecuniary benefit." *Sculptchair,* 94 F.3d at 628.

In *Sculptchair*, 94 F.3d at 628, the Eleventh Circuit found that personal jurisdiction was improper over a defendant who had not "manufactured, sold, leased or solicited orders" for its products, nor did they maintain offices or agents in the state. Similarly, Altadis, S.A. has no office in Florida, nor does it lease or own any property. It has no permanent or regular employees here and no bank accounts. In addition, while Altadis, S.A. launched a new product, VegaFinas, in the United States. Plaintiff has not established any sales in Florida. In any case, sales of the product have been discontinued. In sum, Plaintiff has failed to show a pattern of business activity by Altadis, S.A. so as to satisfy § 48.193(1)(a).

### c. Committing a Tortious Act in Florida under § 48.193(1)(b)

Finally, Plaintiff also argues that Altadis, S.A. is subject to the jurisdiction of courts in Florida because the conduct that Plaintiff alleges amounts to committing a tort within the state. In support of this proposition, Plaintiff relies on a recent Florida Supreme Court case, *Execu–Tech Bus. Sys., Inc. v. New Oji Paper Co.*, 752 So.2d 582 (Fla.2000). In *Execu–Tech*, the plaintiff brought a class-action suit under federal and Florida antitrust laws, alleging that the defendant engaged in a nationwide scheme to fix prices for thermal facsimile paper. The defendant maintained no office in Florida, and the plaintiff had not shown that any of the product was sold in Florida during the class period. Nonetheless, the court concluded that the complaint had sufficiently alleged that the defendant had committed a tort in Florida under § 48.193(1)(b) because it alleged that the defendant had "deliberately conspired to fix the wholesale price of their product throughout the United States, including Florida." *Id.* at 585. Because this conduct, if proven, would violate the Florida Deceptive and Unfair Trade Practices

Act, the defendant had subjected itself to the jurisdiction of Florida courts. *Id.*

Like the plaintiff in *Execu–Tech*, Plaintiff has alleged antitrust violations that, if proven, would violate the Florida Deceptive and Unfair Trade Practices Act The *Execu–Tech* court specifically identified violating the Florida Deceptive and Unfair Trade Practices Act as a tort in Florida. *Id.* Moreover, general antitrust violations are considered intentional torts due to the unreasonable effects that they have on competition. *Williams Elec. Co. v. Honeywell, Inc.*, 854 F.2d 389, 394 (11th Cir.1988) Therefore, Plaintiff has alleged that Altadis, S.A. has committed a tort in Florida.

It should be noted, however, that some courts have added another level to the analysis under § 48.193(1)(b). In *Williams*, 854 F.2d at 394, the Eleventh Circuit found that for personal jurisdiction to attach under the tortious activity provision of Florida's long-arm statute, the plaintiff must demonstrate that the non-resident defendant "committed a substantial aspect of the alleged tort in Florida." *Id.* (quoting *Watts v. Haun*, 393 So.2d 54, 56 (Fla. 2d DCA 1981)). This showing is made, according to the *Williams* court, when the plaintiff establishes that the activities in Florida "were essential to the success of the tort." *Id.* (finding jurisdiction under § 48.193 because the defendant negotiated certain subcontracts in the Florida without which there would have been "no resulting damage to [the plaintiff]"). If Plaintiff in this case were required to show that Altadis, S.A.'s activities in Florida were essential to the success of the alleged tort, jurisdiction would seem improper under § 48.193(1)(b). The only contacts that Altadis, S.A. has established that are directly related to Plaintiff's cause of action are the meetings attended by its agents to discuss issues relating to the mergers of

Havatampa and Consolidated. While these contacts are relevant to the allegedly monopolistic position of the defendants, Plaintiff has not established that "but for" these contacts, the alleged damages would not have occurred.

■■■ Nonetheless, the Florida Supreme Court did not include this "but for" requirement in its analysis in *Execu–Tech*. *Execu–Tech*, 752 So.2d at 585. In fact, the court did not even require the plaintiff to establish that any product was sold in Florida. It was sufficient, held the court, that the plaintiff had alleged that the fax paper produced and distributed by the conspirators was sold at a correspondingly inflated retail price in every state, including Florida. *Id.* at 585. Thus, as this Court is required to interpret the Florida long arm statute as would the Florida Supreme Court, it is sufficient in this case that Plaintiff has alleged that Altadis, S.A. has monopolized, restrained, and/or foreclosed competition in the "cigar markets" in every state including Florida. Plaintiff has therefore properly invoked § 48.193(1)(b) of Florida's long-arm statute.

### 2. Due Process Analysis

■■■ Even where the Florida long-arm statute applies, jurisdiction is improper unless it satisfies due process requirements. *Burger King*, 471 U.S. at 463–64, 105 S.Ct. 2174; *Dimaggio, LLC v. San Francisco*, 187 F.Supp.2d 1359, 1371 (S.D.Fla.2000) (finding that the defendant was within the reach of § 48.193(1)(b), Fla.Stat., but concluding that exercising jurisdiction would violate due process). Due process principles safeguard defendants from being unwillingly placed under the jurisdiction of a foreign court in a manner that is unjust and inequitable. *Hanson v. Denckla*, 357 U.S. 235, 251, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). To determine whether due process principles would be satisfied were

jurisdiction exercised, a court considers first whether "the nonresident defendant has purposely established minimum contacts with the forum state." *Francosteel Corp. v. M/V Charm*, 19 F.3d 624, 627 (11th Cir.1994) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). If minimum contacts exist, the court considers whether exercising jurisdiction will "offend traditional notions of fair play and substantial justice." *Id.*

Where, as here, the defendant falls within reach of the Florida long-arm statute's specific jurisdiction provisions, satisfying minimum contacts requires three steps:

> First, the contacts must be related to the plaintiff's cause of action or have given rise to it. Second, the contacts must involve some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws. Third, the defendant's contacts with the forum must be such that [the defendant] should reasonably anticipate being haled into court there.

*Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1546 (11th Cir.1993) (internal citations and quotation marks omitted)

With respect to the first step, the "relatedness prong," Plaintiff need only establish that Altadis, S.A.'s contacts were related to Plaintiff's claims. That is, even if the contacts were non-essential to the cause of action, they still may show a sufficient nexus with the litigation to satisfy the first step. *See Carrillo*, 115 F.3d at 1544 (emphasizing that the defendant's contacts must relate to the cause of action *or* have given rise to it). In this case, contacts related to Plaintiff's cause of action would be any contacts connected to Plaintiff's claims of alleged anti-competitive behavior by Altadis, S.A. This alleged

anti-competitive behavior was made possible by Altadis, S.A. achieving an allegedly monopolistic position through various mergers, including the merger of Havatampa and Consolidated Cigar. Thus, any contacts related to Altadis, S.A.'s ability to illegally control the market for premium cigars and monopolize the market for non-Cuban cigars are relevant.

Altadis, S.A.'s participation in the Florida meetings fit this description. The Florida meetings were for the purpose of discussing issues and strategy in connection with the merger of Havatampa and Consolidated Cigar. Without consolidation of these companies, Altadis, S.A. would not have been able to accomplish the harm that Plaintiff alleges. These contacts, albeit limited, are therefore related to Plaintiff's cause of action. *See Delong Equip. Co. v. Washington Mills Abrasive Co.,* 840 F.2d 843, 849 (11th Cir.1988) (finding that a meeting attended by the defendant's agent was sufficiently related to Plaintiff's antitrust claims because the meeting's focus "directly concern[ed] many of the claims raised in [the plaintiff's] complaint: division of markets, price discrimination, and illegal conduct restricting competition")

Nevertheless, it is not enough to show that a defendant's limited contacts are related to the cause of action. Under the second prong, the defendant must have "purposely availed itself of the privileges of doing business in the forum." *Vermeulen,* 985 F.2d at 1546. This requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random, fortuitous, or attenuated contacts." *Burger King,* 471 U.S. at 478–79, 105 S.Ct. 2174 (citations omitted).

In *Delong,* 840 F.2d at 854, the Eleventh Circuit found that the defendants purposely availed themselves of the privilege of conducting business within Georgia because "the primary focus of [the defendants'] alleged illegal conduct was the Georgia market." Specifically, the defendants attempted to control the supply of media to Georgia consumers through "conspiratorial negotiations" at a meeting in Atlanta and through subsequent specific efforts to exclude the plaintiff from the Georgia market. *Id.* In *Vermeulen,* 985 F.2d at 1550, the Eleventh Circuit found that the defendant had purposely availed itself of the laws of the United States as a whole for a product liability suit because the defendants "designed the [product] for the American market, advertised [the product] in the United States, established channels for customers in the United States to seek advice about [the product], and maintained a distribution network by which [the products] were imported into the United States."

When compared to the activities in *Delong* and *Vermeluen,* the contacts of Altadis, S.A. fall well short of establishing purposeful availment. Altadis, S.A. sent one executive to three meetings in Florida that were related to a merger of two of its United States subsidiaries. This is simply not enough to put Altadis, S.A. on notice that it could be brought before a Florida court in an antitrust action alleging harm to the United States market for cigars. Plaintiff has not established that Florida was the focal point of the alleged illegal activity, nor has it established that Altadis, S.A. was connected to the Florida market the way that the defendant in *Vermeulen* was connected to the United States as a whole of the defendant in *Delong* was connected to Georgia.

Moreover, while advertisements reasonably calculated to reach the forum may constitute an act of purposeful availment, *see Carrillo,* 115 F.3d at 1545, there is insufficient evidence in this case to conclude that the advertisements may even be attributed to Altadis, S.A. Despite the fact

that the advertisements bear the name "Tabacalera de España," Plaintiff seeks to attach the advertisements to Altadis, S.A. because the cigars "were manufactured by companies owned by Altadis, S.A. . . . the trademarks were owned by another Altadis, S.A. subsidiary . . . the advertised cigars were in fact sold in the United States; and that "Tabacalera de España" refers to the "heritage" of Tabacalera, S.A. (i.e. "Altadis, S.A.)." Plaint.Supp.Mem. at 6. Plaintiff asserts, therefore, that the advertisements were under the control of Altadis, S.A. This assertion is unsupported by the record, even after construing reasonable inferences in favor of Plaintiff. According to direct testimony by Antonio Vasquez, the "Tabacalera de Espña" advertising campaign was a "marketing concept designed by Havatampa." Vasquez further explained that the campaign "was created in the United States for the United States and never used outside the United States." Vasquez Dep. at 8–9. These advertisements, therefore, do not show that Altadis, S.A. purposefully availed itself of the privileges of doing business in the forum. In sum, the contacts do not rise above the level "fortuitous" or "attenuated." *Burger King*, 471 U.S. at 478–79, 105 S.Ct. 2174 (citations omitted).

Finally, the Court rejects Plaintiff's alternative argument that jurisdiction is proper under *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) because the effects of Altadis, S.A.'s conduct was felt in Florida. In *Calder*, the defendants wrote an allegedly libelous article about a California entertainer. The Court explained that California was "the focal point both of the story and of the harm suffered" *Id.* at 789, 104 S.Ct. 1482. Thus, despite the fact that the defendants had insufficient physical, mail or telephone contacts with California, the Supreme Court found that personal jurisdiction was proper based on the "potentially devastating" effects in California of the defendants'

out of state conduct. *Id.* at 790, 104 S.Ct. 1482.

Unlike California in *Calder*, there has been no showing that Florida was the focal point of either Altadis, S.A.'s alleged illegal activities or the alleged harm suffered by Plaintiff. Plaintiff merely states that because the actions of Altadis, S.A. have had "illegal effects within the United States," Altadis, S.A. may be brought before this Court in Florida. The minimum contacts requirement of the Due Process Clause would be worthless if foreign defendants could be brought before a court in Florida merely by alleging "illegal effects within the United States." Accordingly, the Court finds that Plaintiff has failed to establish that Altadis, S.A. has purposely availed itself of the privilege of conducting business in Florida.

Having found no purposeful availment, there is no need to go any further. Jurisdiction over Altadis, S.A. is lacking. Plaintiff's claims against Altadis, S.A. must be dismissed.

## II. Altadis U.S.A., Inc and Consolidated Cigar Holdings Inc.'s Motion to Dismiss for Failure to State a Claim

The Court now turns to Altadis U.S.A. and Consolidated Cigar's motion to dismiss each of Plaintiff's substantive counts in the complaint pursuant to Fed.R.Civ.P. 12(b)(6). A court will not grant a motion to dismiss unless the plaintiff fails to prove any facts that would entitle it to relief *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *St. Joseph's Hosp., Inc. v. Hosp. Corp. of America*, 795 F.2d 948 (11th Cir. 1986).

## A. The Antitrust Claims

### 1. Attempted Monopolization under Sherman Act § 2

Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize" a product market.[5] Plaintiff alleges that Defendants have violated Sherman Act § 2 by attempting to monopolize the markets for cigars and for non-Cuban premium cigars. Defendants contend that the Court should dismiss this claim because Plaintiff has not alleged that Defendants hold at least 50% of the market share. Because the Court agrees with Defendants and finds that there is no dangerous probability of monopoly power, the claim is dismissed.

To prove its attempted monopolization claim, Plaintiff must show: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *Technical Res. Servs., Inc. v. Dornier Med. Sys., Inc.*, 134 F.3d 1458, 1466 (11th Cir.1998); *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 993 (11th Cir.1993).

As did the *U.S. Anchor* court, this Court considers the factors for attempted monopolization in reverse order, beginning with dangerous probability of monopoly. *U.S. Anchor.* 7 F.3d at 993. Whether Defendants have a dangerous probability of monopoly involves quantifying the degree of their power in the relevant market. *Technical Res.*, 134 F.3d at 1466; *U.S. Anchor*, 7 F.3d at 994. The Court must therefore consider the issue in two steps, by first defining the relevant market and then measuring the Defendants' market power. *U.S. Anchor*, 7 F.3d at 994.

### a. Relevant Market

"Defining a relevant product market is primarily 'a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other.'" *U.S. Anchor*, 7 F.3d at 994 (quoting *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805 (8th Cir.1987)). Market definition often includes consideration of various factors, including the products' qualities, uses and prices. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Markets relevant to antitrust analysis can also include submarkets, if such submarkets are well-defined. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Defining a 'submarket' is the equivalent to defining a relevant product market for antitrust purposes. *U.S. Anchor*, 7 F.3d at 995. In the end, the definition of a relevant market is "essentially a factual question." *Id.* at 994–95 (citing *Yoder Bros. v. California Florida Plant Corp.*, 537 F.2d 1347, 1366 (5th Cir.1976)).

For the purposes of its attempted monopolization claim, Plaintiff identifies the relevant markets as "cigars and non-Cuban premium cigars." Compl. ¶ 40. Cigars are distinguished from other tobacco products based on their distinctive tastes, aromas, size, shape, and other characteristics Compl. ¶ 9. Non–Cuban premium cigars have "tastes, aromas, histories, reputations and other characteristics that differ from Cuban premium cigars." Compl.

---

**5.** Section 2 of the Sherman Act provides in pertinent part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2 (2002).

¶ 11. Plaintiff proposes that the relevant geographic markets are "the world" for cigars and the United States for "certain types of cigars." Compl. ¶¶ 12, 13.

■ After considering the factors identified above, and mindful of the fact that notice pleading is all that is required for a valid antitrust complaint, *see Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp.*, 711 F.2d 989, 995 (11th Cir.1983), the Court concludes that Plaintiff has sufficiently alleged that the relevant markets for purposes of its attempted monopolization claim are the markets for cigars and the non-Cuban premium cigars.

### b. Dangerous Probability of Achieving Monopoly Power

■ Having alleged relevant markets for its claim, Plaintiff must also allege that Defendants have sufficient power in the markets. "To have a dangerous probability of successfully monopolizing a market the defendant must be close to achieving monopoly power." *U.S. Anchor*, F.3d at 994. In considering this question, relevant factors include a defendant's "absolute and relative market shares, and those of competing firms; the strength and capacity of current competitors; the potential for entry; the historic intensity of competition; and the impact of the legal or natural environment." *Id.* (citing *Int'l Tel. & Tel. Corp.*, 104 F.T.C. 208, 412 (1984)). Despite all of these factors, however, the principle judicial device for measuring actual or potential market power is market share, typically measured in the percentage of total market shares. *Id.*

In the complaint, Plaintiff charges that Defendants control 39% of the U.S. premium cigar market. Compl. ¶ 14. Defendants argue that this percentage is insufficient to state a claim under the standard set by the Eleventh Circuit in *U.S. Anchor*. In *U.S. Anchor*, a jury found the defendants liable for attempted monopolization of the fluke anchor market, in which the defendant held an aggregate share of 30.1%. The defendant moved for judgment notwithstanding the verdict and the district court denied the motion. The Eleventh Circuit reversed, finding that the defendant was unable to hold a majority position in the relevant market throughout the relevant time period. The court concluded, therefore, that "because [the defendant] possessed less than 50% of the market at the time the alleged predation began and throughout the time when it was alleged to have continued, there was no dangerous probability of success … *as a matter of law.*" *Id.* at 1001 (emphasis added).

Plaintiff contends that the *U.S. Anchor* court's conclusion is not fatal to its claim because the court acknowledged additional factors that may be considered in analyzing market power. The court explained that analyzing market power is "necessarily speculative to some extent because it requires an evaluation of future behavior by market participants, viewed at the time the alleged attempt began." *Id.* at 994. Thus, as stated by the former Fifth Circuit, "one must be particularly wary of the numbers game of market percentage when considering an 'attempt to monopolize' suit" *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n. 2 (5th Cir.1969).

In addition, courts outside the Eleventh Circuit have found a sufficient claim for attempted monopoly with an allegation of less than 50% market share. In *L & W/Lindco Prods., Inc. v. Pure Asphalt Co.*, 979 F.Supp. 632, 637 (N.D.Ill.1997), for example, the plaintiff alleged only a 40% market share. The defendant moved to dismiss the claim as insufficient as a matter of law. The court denied the motion, finding that alleging only a 40% market share did not preclude the defendant

"from proving at trial the 'dangerous probability' element because market share is not dispositive of market power." *Id.; see also Rebel Oil Co., Inc. v. Atlantic Richfield Co.,* 51 F.3d 1421, 1438 (9th Cir.1995) (finding summary judgment unwarranted because defendant's market share of 44% was sufficient as a matter of law to support a finding of market power").

 Nevertheless, consistent with *U.S. Anchor,* if a plaintiff is to sustain an attempted monopolization claim with an allegation of less than 50% market share, he must also allege other reasons that make a monopoly "dangerously probable." In *L & W/Lindco Products,* in addition to alleging 40% market share, the plaintiff also claimed that the defendant was the largest single supplier, that plaintiff was nearly out of business and thereby ceding its own 35% market share, that only a small number of firms were market participants, and that the number of competitors was declining. *L & W/Lindco Prods.,* 979 F.Supp. at 637. Similarly, in *Rebel Oil,* the Ninth Circuit held that 44% was sufficient, but only if "entry barriers are high and competitors are unable to expand their output in response to supracompetitive pricing." *Rebel Oil,* 51 F.3d at 1438.

 By contrast, Plaintiff's complaint both fails to allege a majority market share *and* fails to allege additional factors that make Defendants supposed attempt to monopolize the markets for cigars and Non–Cuban premium cigars a likely success. Plaintiff does not, for example, allege facts relating to its own market share compared to Defendants' share, nor does it make allegations about the barriers to entry in the market. Instead, Plaintiff rests only on the 39% market share in the U.S. cigar market that Defendants obtained through their consolidation. Compl. ¶¶ 14, 40. Under these facts, Plaintiff cannot establish a dangerous probability of monopoly. It is unnecessary for the Court to

consider the alleged predatory or anticompetitive conduct or the defendant's intent. The attempted monopolization claim must be dismissed.

### 2. Monopoly Leveraging under Sherman Act § 2

Plaintiff next claims that Defendant has violated Sherman Act § 2 by leveraging its monopoly in Cuban cigars, achieved through its 50% acquisition of Habanos, to expand its position in the markets for non-Cuban cigars. Plaintiff's claim does not require the Court to find that Defendants have actually achieved a monopoly in non-Cuban cigars or even attempted to achieve a monopoly in non-Cuban cigars. Plaintiff has merely alleged that Defendant has used its monopoly in Cuban cigars to gain a "competitive advantage" in order to "foreclose competition" in the markets for non-Cuban cigars. As explained below, this allegation is insufficient to support a cause of action under Sherman Act § 2.

"Monopoly leveraging" as a theory of antitrust liability arose from the Second Circuit's decision in *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 275 (2d Cir.1979) and has been called into serious doubt since. In *Berkey Photo,* the plaintiff alleged that Kodak had leveraged its monopoly in the film and camera markets into an advantage in the photofinishing equipment and services markets. Despite the fact that there was no probability of monopolization of either the photofinishing equipment and services markets, the court found that Kodak was liable because it had used its monopoly power to the detriment of competition. As the Second Circuit explained, "[t]hat the competition in the leveraged market may not be destroyed but merely distorted does not make [exercising monopoly power] more palatable." *Id.*

The *Berkey Photo* court relied on broadly stated Supreme Court dicta from the case of *United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). *Griffith* involved movie theater operators who acted in concert to restrict the number of movies available to competing theaters. In that case, the Court stated broadly that "the use of monopoly power, however lawfully acquired, to foreclose competition, *to gain a competitive advantage,* or to destroy a competitor, is unlawful." *Id.* at 107, 68 S.Ct. 941 (emphasis added). *Griffith* may be distinguished from this case, however, because it involved Sherman Act § 1 violations by firms acting in concert, not one firm's unilateral action and Sherman Act § 2. Moreover, the Court in *Griffith* never reached the issue of whether the operators had leveraged their power in one market for a competitive advantage in another, nor did it speak to the lawfulness of such activity. *Griffith* is therefore not dispositive here. *See Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 206 (3d Cir.1992).

In fact, neither the Supreme Court nor the Eleventh Circuit have specifically acknowledged monopoly leveraging as a valid antitrust cause of action.[6] In *Aquatherm Indus., Inc. v. Florida Power & Light Co.,* 145 F.3d 1258, 1262 (11th Cir.1998), the Eleventh Circuit confronted the theory but declined to adopt or reject it. There, the defendants did not even seek to compete in the allegedly leveraged secondary market. Thus, finding liability would have required

the court "to extend *Berkey Photo* to a situation in which a monopolist projects its power into a market it not only does not seek to monopolize, but in which it does not even seek to compete." *Id.* at 1262.

Plaintiff argues that in declining to extend the theory, the Eleventh Circuit implicitly recognized it as well. This Court disagrees. The *Aquatherm* court rejected the claim under the facts of the case without commenting on the propriety of the cause of action in general. That the court declined to apply the theory in one situation does not mean that it approved the theory for use in other situations. Thus, contrary to Plaintiff's assertions, *Aquatherm* does not amount to an Eleventh Circuit recognition of the monopoly leveraging cause of action. *See Morris Comm. Corp. v. PGA Tour, Inc.,* 117 F.Supp.2d 1322, 1330 (M.D.Fla.2000) (citing *Aquatherm* and noting that "neither the Eleventh Circuit nor the Supreme Court has yet accepted the monopoly leveraging theory").

Circuits other than the Eleventh are split on whether a cause of action for monopoly leveraging exists. *See Eleven Line, Inc. v. North Tex. State Soccer Ass'n.* 213 F.3d 198, 206 n. 16 (5th Cir. 2000) (declining to endorse or rule on monopoly leveraging while noting the circuit split). *Compare Fineman,* 980 F.2d at 204–06 (rejecting the theory as established in *Berkey Photo* and holding that a plaintiff must prove actual or threatened mo-

---

**6.** In *Key Enterprises of Del., Inc. v. Venice Hosp.,* 919 F.2d 1550, 1566–68 (11th Cir. 1990) (*"Key I"*), *reh'g granted,* 979 F.2d 806 (11th Cir.1992), *vacated as moot,* 9 F.3d 893 (11th Cir.1993) (*"Key II"*), *cert. denied* 511 U.S. 1126, 114 S.Ct. 2132, 128 L.Ed.2d 863 (1994), an Eleventh Circuit panel did recognize a monopoly leveraging claim. However, while a petition for rehearing was pending, the parties settled the case. The panel's decision was therefore vacated, and the case was remanded to the district court for dismissal.

*Key II,* 9 F.3d at 899. Nonetheless, even if the panel's decision had become mandate, it would be distinguishable from this case. The *Key I* panel found monopoly leveraging applicable because the plaintiff had "abuse[d] its monopoly power in one market as a means of gaining a competitive advantage *and monopolizing* another market...." *Key I,* 919 F.2d at 1568. Here, Plaintiff has merely alleged that Defendants have gained a competitive advantage in the "leveraged" market without showing that they have monopolized it.

nopoly in the leveraged market), *and Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 546 (9th Cir.1991) (rejecting the doctrine), *with Kerasotes Mich. Theatres, Inc. v. Nat'l Amusements, Inc.,* 854 F.2d 135, 137 (6th Cir.1988) ("To run afoul of the antitrust laws, it is not necessary that the party attempting to leverage its monopoly power from a given market into a second market possess monopoly power or dominant market position in that second market.").

This Court, after considering the arguments of both parties, adopts the position of the Third and Ninth Circuits and rejects the cause of action. This conclusion is buttressed by the Supreme Court's commentary on Sherman Act § 2 liability, and the general requirement that a threat of monopoly is required, not merely a "competitive advantage." In *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 767, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the Supreme Court distinguished Sherman Act § 1 and § 2. While § 1 prohibits "restraints of trade" by concerted action between multiple firms, § 2 makes illegal "monopoly and attempted monopoly." To be liable under § 2, therefore, a single firm must engage in anticompetitive actions more severe than that required for firms acting in concert under § 1. That is, a firm's unilateral conduct is unlawful under § 2 "only when it threatens actual monopolization." *Id.* As it can be difficult to discern illegal conduct from zealous but pro-competitive activity, "Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur." *Id.* at 768, 104 S.Ct. 2731.

The theory of monopoly leveraging ignores this crucial distinction between Sherman Act § 1 and Sherman Act § 2,

and allows liability under § 2 for unilateral action that falls well below threatened monopolization. Quite simply, as dictated by the language of § 2, a plaintiff must prove either that the defendant has monopolized a market or attempted to monopolize a market. Allowing liability for less would turn § 2 into a law prohibiting merely "unfair" but non-monopolistic unilateral activity. Section 2 is not such a law. *See Fineman,* 980 F.2d at 205 (concluding that "monopoly leveraging to proscribe unilateral restraints of trade does violence to the text of the Sherman Act...."); *see also* 3 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law,* ¶ 652c, at 97 ("The gravamen of the offense is *not* the enlargement of the defendant's market share at the plaintiffs' expense or even the destruction of plaintiffs by unfair means. Rather, it must be monopoly performance measured by reduced output or higher prices in the secondary market.")

Further, the cause of action fails to recognize that the monopoly power used by the defendant to leverage its competitive advantage in the secondary market may have been reached through legal means. *See Alaska Airlines,* 948 F.2d at 547 (citing examples of lawful monopolies). For example, a monopolist may have reached monopoly status through superior production or innovation, or may have obtained a "natural monopoly" by being dominant in market that has demand that is "too thin" to support more than one firm. *Id.* As the Sherman Act does not make illegal these types of monopolies, it certainly does not make illegal the use of these monopolies to gain a competitive advantage in another market. "The anticompetitive dangers that implicate the Sherman Act are not present when a monopolist has a lawful monopoly in one market and uses its power to gain a competitive advantage in the second market." *Id.* at 548. The monopoly leveraging cause of action nonetheless

sweeps into its realm this type of non-monopolistic behavior and makes it prohibited under Sherman Act § 2. If permitted to stand, any natural monopolist who seeks to use its success to compete in a second market would potentially be liable. This result crosses the all-important line in antitrust cases that separates fostering competition from hindering it.

The monopoly leveraging cause of action is insufficient as a matter of law where the defendant has not monopolized or attempted to monopolize the secondary market but merely seeks to "gain a competitive advantage." Thus, as the Court has already concluded that Plaintiff's complaint fails to state a claim for attempted monopolization in the markets for cigars and U.S. non–Cuban premium cigars, Plaintiff's claim for monopoly leveraging must also be dismissed.

### 3. Tying & Full Line Forcing under Sherman Act § 1 and Clayton Act § 3

Counts III and IV of Plaintiff's complaint allege that Defendant has conditioned the sale of Cuban premium cigars on the purchase of non-Cuban premium cigars and have thereby coerced customers to purchase Defendant's non-Cuban premium cigars. Of course, Plaintiff does not allege that Defendant is currently selling Cuban cigars and conditioning sales of Cuban cigars on sales of non-Cuban cigars. Selling Cuban cigars is prohibited by the Cuban embargo.[7] Rather, Plaintiff contends that Defendant is conditioning the promise of future sales of Cuban cigars (if the embargo is lifted) on the present purchase of non-Cuban cigars. This activity, claims Plaintiff, constitutes full-line forcing[8] and an invalid tying arrangement under Sherman Act § 1 and Clayton Act § 3.[9]

"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 462, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (quoting *N. Pac. Ry. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)). The Supreme Court explained in *Jefferson Parish*, 466 U.S. at 12, 104 S.Ct. 1551 that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied

---

7. The Cuban embargo, regulated under the Cuban Assets Control Regulations, 31 C.F.R. §§ 515.101–515.901 (2002), was codified by the Cuban Liberty and Democratic Solidarity (Libertad) Act, Pub.L. No. 104–114, 110 Stat. 785 (1996) as 22 U.S.C. § 6032(h). 31 C.F.R. § 515.201(b) prohibits transactions involving property in which Cuba, or any national thereof, has "any interest of any nature whatsoever, direct or indirect."

8. " 'Full-line' or 'representative-line' forcing occurs when a 'manufacturer agrees to license or franchise a dealer to sell its products, but only on condition that the dealer sell a full or representative line of those products.'" *S. Card & Novelty, Inc. v. Lawson Mardon Label, Inc.*, 138 F.3d 869, 875 n. 8 (11th Cir.1998) (quoting *Smith Mach. Co. v.*

*Hesston Corp.*, 878 F.2d 1290, 1294 (10th Cir.1989)).

9. Sherman Act § 1, 15 U.S.C. § 1, which prohibits contracts, combinations, or conspiracies in "restraint of trade," and Clayton Act § 3, 15 U.S.C. § 14, which makes illegal engaging in commerce so as to "substantially lessen competition," are considered under the same standard. *S. Card & Novelty*, 138 F.3d at 874 (quoting *Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir.1981)); *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 23 n. 39, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (noting that "with respect to the definition of tying the standards used by the two statutes are the same").

product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." In order for the seller to be able to "force" its tied product on an otherwise unwilling buyer, the seller must have sufficient market power in the tying market. *Id.* at 14, 104 S.Ct. 1551.

To allege a tying claim, therefore, a plaintiff must identify the relevant market in which the tying product exists, and must allege that the seller has sufficient power within that market to be able to force buyers to purchase the tied product. *Id.* at 21, 104 S.Ct. 1551 (stating that "a tying arrangement cannot exist unless two separate product markets have been linked"). To do this requires a "determination [of] precisely what the tying and tied product markets are." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 443 (3d Cir.1997) (dismissing the plaintiff's tying claim because the proposed tying market was "not a relevant market for antitrust purposes").

A relevant market consists of both a product and a geographic component. *Thompson v. Metro. Multi–List, Inc.*, 934 F.2d 1566, 1572 (11th Cir.1991). Defining a product market generally involves "describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other." *U.S. Anchor,* 7 F.3d at 995 (internal quotations omitted). While markets usually involve multiple firms producing multiple products, in exceptional circumstances a relevant product market may consist of a single brand. *U.S. Anchor,* 7 F.3d at 998 ("A single branded product may, in rare cases, constitute its own relevant market"). This may occur if a product is unique and has no interchangeable substitutes.

A geographic market, on the other hand, is the "area of effective competition" in which competitors compete for consumers. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1247 (11th Cir.2002) (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327–29, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)). This area is where "the product or its reasonably interchangeable substitutes are traded." *T. Harris Young & Assoc., Inc. v. Marquette Elec., Inc.*, 931 F.2d 816, 826 (1991). In defining the geographic market, courts look at various factors, including "[p]rice data and such corroborative factors as transportation costs, delivery limitations, customer convenience and preference, and the location and facilities of other producers and distributors." *Id.* Overall, though, the geographic market must be one that corresponds to the commercial realities of the particular industry. *Eastman Kodak,* 504 U.S. at 467, 112 S.Ct. 2072.

In this case, the crux of Plaintiff's claim is that Defendant is leveraging the sales of Cuban cigars in order to force sales of its other products. Thus, according to Plaintiff, the relevant market for the tying product is the market for Cuban cigars. This proposed tying market is immediately suspect, however, because selling Cuban cigars is forbidden by the Cuban embargo. Defendants therefore have no power to sell their proposed tying product in the United States. Defendants' ability to leverage its power in a Cuban cigar market into power in a non-Cuban cigar market depends on its ability to actually sell the product in the Cuban cigar market. After all, tying is the process of conditioning the *sale* of one product on the *sale* of another.

As Defendants have no power to sell the product in the tying market, Plaintiff in essence alleges only that Defendant is leveraging the *promise of future* sales of Cuban cigars. The ability to act on this promise, of course, depends on the embargo being lifted and the sales of Cuban

cigars becoming legal. Such a change in circumstances is entirely speculative. Under 22 U.S.C. §§ 6064(a), (c), the President is authorized to suspend the Cuban embargo only after determining that a "transition government in Cuba is in power," and may take steps to terminate the embargo after determining that "a democratically elected government is in power." A qualifying "transition government" must legalize all political activity, release all political prisoners, publicly commit to organized and timely implemented "free and fair elections," cease interference with Radio Marti or Television Marti broadcasts, demonstrate progress in establishing an independent judiciary and allow for the establishment of independent trade unions as well as social, economic and political associations and may not include Fidel or Raul Castro. 22 U.S.C. § 6065(a); *see also Havana Club Holding, S.A. v. Galleon S.A.,* 203 F.3d 116, 132 (2d Cir.2000) (finding no standing to assert Lanham Act violations based on injury to future sales of Cuban cigars because such sales are "speculative" and prevented by the "formidable" obstacle of the Cuban embargo). Thus, before Defendants can leverage sales of Cuban cigars into sales of non-Cuban cigars, a significant number of hurdles must be overcome.

██ If someday Cuban cigars are legally sold in the United States, and if Plaintiff can plead all of the requirements for a tying claim, Plaintiff may have a cause of action. Without a legal market for Cuban cigars, however, Plaintiff cannot define a relevant market so as to demonstrate that Defendants have the requisite market power in the tying market. Accordingly, Plaintiff's claims for tying and

full-line forcing are dismissed without prejudice.

### 4. Florida Antitrust Act

Count VII alleges violations of the Florida Antitrust Act, § 542.15, FlaStat. *et seq.* (2002). Plaintiff's claims under this count are analyzed the same as Federal Antitrust claims. *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.,* 135 F.3d 740, 745 n. 11 (11th Cir.1998). Accordingly, the Florida Antitrust claims survive only to the extent that the federal claims survive. As the Court has dismissed each of Plaintiff's claims under the Sherman and Clayton Act for the reasons stated above, the Court also dismisses Plaintiff's claims under the Florida Antitrust Act.

### B. The Trademark Claims

Counts V and VI of Plaintiff's complaint allege that Defendants have violated Lanham Act § 43(a), 15 U.S.C. § 1125(a), by making "false or misleading descriptions of fact" concerning two of Plaintiff's trademarks, "Punch" and "Partagas."[10] These marks are used to sell cigars that Plaintiff describes as enjoying a widespread and favorable reputation in the United States. According to the complaint, Defendants' salespeople have been telling their customers that Plaintiff will lose their rights in "Punch" and "Partagas" cigars after the embargo against Cuba is lifted. That is, once Cuban cigars may be legally sold in the United States, Defendants, not Plaintiff, will be selling cigars with the trademarks "Punch" and "Partagas."

██ Defendants argue in the motion to dismiss that these statements, assuming they were made, are not actionable under

---

10. Plaintiff also alleges in the complaint that Antonio Vasquez, one of Defendant Altadis U.S.A.'s agents made deceptive statements about the lack of "fixed assets" that could

trigger "the Helms–Burton law." Compl. ¶ 35. This allegation does not, however, relate to the Lanham Act claims.

the Lanham Act as they are mere statements of opinion. The language of 15 U.S.C. § 1125(a) specifies that Lanham Act liability arises from representations of *fact*. 15 U.S.C. § 1125(a) (emphasis added). To be a statement of fact, the statement must be capable of being proven false. *Coastal Abstract Serv., Inc. v. First American Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir.1999). False statements about a plaintiff's ownership rights in validly owned and registered trademarks may create liability, as such statements may he disproved. *See, e.g.*, *CPC Int'l. Inc. v. Skippy, Inc.*, 651 F.Supp. 62, 67 (E.D.Va.1986) (finding "that it is unfair competition for [the defendants] to make false claims about [the plaintiff's] rights" in its trademark). Plaintiff argues that liability attaches here because the validity of the "Punch" and "Partagas" marks is "incontestable" and Defendant's agents have been spreading falsities about Plaintiff's ownership rights.

▉ The issue here, however, is not Plaintiff's current ownership rights in "Punch" and "Partagas" but Plaintiff's future ownership rights when or if the Cuban embargo is lifted. Defendant's agents have speculated about the effect that a lifting of the Cuban embargo restrictions would have on the trademark rights of Plaintiff. Such speculative legal analysis does not give rise to Lanham Act liability unless it can be shown to be false. "Absent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact." *Coastal*, 173 F.3d at 731. In *Coastal*, the defendant made statements alleging that the plaintiff was required under California law to obtain a license but had failed to do so. The plaintiff argued that it did not qualify under the applicable statute and therefore the license was unnecessary. The Ninth Circuit held

that the statements were not actionable because the correct application of the statute was not knowable to the parties at the time the statements were made. *Id.* at 732.

Similarly, as the Cuban embargo has not yet been lifted, Plaintiff will not be able to prove that the statements allegedly made by Defendants' agents are indeed false. That is, there has been no clear and unambiguous ruling by a court or agency determining the effect that lifting the Cuban embargo would have on non-Cuban cigar trademark owners. Accordingly, the statements by Defendant's agents that lifting the Cuban embargo will negatively affect Plaintiff's rights in "Punch" and "Partagas" are opinions based on a possible future event, not statements of fact as required by 15 U.S.C. § 1125(a). *See Randa Corp. v. Mulberry Thai Silk, Inc.*, 2000 WL 1741680, at *3 (S.D.N.Y. Nov.27, 2000).

## C. The State Law Claims

Having disposed of Plaintiffs' federal claims, the only remaining counts allege violations of Florida state law. Count VIII alleges that Defendants' actions have violated the Florida Deceptive and Unfair Trade Practices Act, § 501.204, Fla.Stat. Count IX alleges that Defendants' have engaged in unfair competition under Florida common law. Count X alleges common law interference with prospective business relations.

Defendants argue that if the federal claims are dismissed, these state claims must fall as well. Plaintiff, on the other hand, contends that these counts allege separate causes of action under state law with or without the federal claims. The Court declines the opportunity to decide these issues of state law. Instead, the Court will exercise its discretion under 28 U.S.C. § 1367(c) and decline to invoke sup-

plemental jurisdiction. Plaintiff may further pursue these claims in state court if it so desires. These claims are therefore dismissed without prejudice to refile in state court.

## CONCLUSION

For the foregoing reasons. Altadis, S.A.'s motion to dismiss for lack of personal jurisdiction is GRANTED. In addition, as none of Plaintiff's federal claims are sufficient to sustain a cause of action, Altadis U.S.A. and Consolidated Cigar's motion to dismiss is also GRANTED.